IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CR-17-94-M |
| ) | |
| MELISSA DAY MORTON, ) | |
| ) | |
| Defendant. ) | |

**THE GOVERNMENT'S RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM**

On 790 separate occasions over seven years, Melissa Day Morton used her long-time employer, the Oklahoma Beef Council ("OBC"), as a personal "cash cow" to embezzle $2,681,400.73 for her personal benefit. Her deception and abuse of trust stole not only Oklahoma beef producers' funds supporting the OBC, but also the confidence that many cattlemen had in the Beef Checkoff Program that Congress created in 1985. To her credit, Ms. Morton has promptly admitted her crimes and cooperated with the government and the OBC to resolve her case and pay back what she can. Still, the Section 3553(a) sentencing factors demand a significant period of jail time commensurate with the lower end of the advisory range of 57-71 months' imprisonment.

# DISCUSSION

The government here seeks only to supplement the detailed PSR and to offer some additional context to Ms. Morton's embezzlement and tax schemes. The PSR is especially helpful to include the detailed victim impact statements from the Oklahoma Beef Council's Board of Directors, its Executive Director, its Office Manager, and others affected by Ms. Morton's fraud. Those statements describe in detail the mission of the Oklahoma Beef Council, the $1 Beef Checkoff Program, the impact of the Checkoff Program funds, and the close-knit livestock community affected so strongly by the embezzlement. Doc. 17, ¶ 22.

This memo briefly addresses the PSR's sentencing enhancement for "sophisticated means" and responds to Ms. Morton's request for a six-month term of imprisonment.

**A. The PSR Correctly Applies a Two-Level Enhancement for "Sophisticated Means" Given the Multiple Layers of Deception.**

The PSR applies a two-level sentencing enhancement for Ms. Morton's offense involving sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). Doc. 17, ¶ 28. "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." U.S.S.G. § 2B1.1(b)(10)(C) app.

n. 9(B). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Huston*, 744 F.3d 589, 592 (8th Cir. 2014) (quotation marks omitted). Put another way, "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013).

Ms. Morton carried out the embezzlement scheme for nearly seven years and forged 790 Beef Council checks for her personal benefit. To execute and conceal the scheme, Ms. Morton had to follow several steps. First, she created false entries in the OBC's Peachtree accounting system to conceal the forged checks made payable to herself, to make it appear the checks were written to a legitimate payee. Second, Ms. Morton altered the OBC's monthly bank statements to reflect valid vendor names on the check images that matched the bogus Peachtree entries. Third, she altered the Beef Checkoff Compliance System ("BCCS") Reports that the OBC provided to independent, third-party auditors during the 2012-15 audits. Ms. Morton specifically altered the BCCS reports to match the false Peachtree entries and sham bank statements that concealed the forged Beef Council checks.[1]

---

[1] In addition, a forensic audit revealed that Ms. Morton wrote fraudulent checks totaling $144,000 in fiscal year 2015, without recording them in the

Several courts have applied the sophisticated-means enhancement to similarly coordinated and repetitive conduct to execute and conceal a fraudulent scheme. *See, e.g.*, *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (affirming a sophisticated-means enhancement where defendant's embezzlement was not considered sophisticated because "she simply took money out of the credit union's vault," but defendant used sophisticated means to conceal crime from auditors "via the extensive manipulation of [the victim's] computer systems and financial records"); *United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014) (affirming an enhancement for a defendant in a fraud scheme who "created at least six false invoices and falsified carbon copies of checks in [the victim's] check register on at least 10 occasions to conceal the payments"); *United States v. Hendricks*, Case No. 10-11206, 434 F. App'x 812, 814 (11th Cir. July 13, 2011) (affirming enhancement for a defendant in a bank fraud scheme who concealed theft by intercepting the victim's monthly bank statements, crediting funds that she fraudulently stole into victim's accounting system, transferring funds within the victim's accounts to cover funds not deposited properly, and manipulating account balances to cover theft).

---

OBC's general ledger.  She then recorded a fictitious check in August 2015 to clear the unidentified differences in the bank reconciliations.

Accordingly, the PSR here accurately applies the sophisticated-means enhancement to Ms. Morton's sentencing calculations.

**B. Meaningful Imprisonment for Ms. Morton Is Appropriate Given the Need for a Sentence to Reflect the Seriousness of the Offense, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct.**

Ms. Morton asks this Court to sentence her only to a sentence of six months' imprisonment based on her "extraordinary restitution efforts," "family circumstances, lack of criminal history," and low likelihood of recidivism. Doc. 19, at 1-2. To be clear, the defense has fully cooperated in the federal criminal investigation and worked with the OBC to maximize restitution payments. Nonetheless, several Section 3553(a) sentencing factors counsel a hefty prison sentence here.

Ms. Morton's swath of direct and collateral damage from the OBC embezzlement is staggering—on the other OBC employees, its volunteer board of directors, the thousands of Oklahoma farmers and ranchers whose Beef Checkoff dollars promote the beef industry, and even out-of-state beef councils now facing suspicion by the fraud. Ms. Morton was a trusted colleague who had worked for the OBC for more than 20 years—and more than 11 years with the two other office employees. Doc. 17, at 12, 14. As the OBC's Accounting and Compliance Manager, Ms. Morton had a complete

understanding—better than anyone else did—of the OBC's most vulnerable business practices and financial reporting procedures.   She exploited them.

The scope of Ms. Morton's embezzlement also hits particularly hard for the Board of Directors and Oklahoma beef producers.   Research indicates a profitable return to the industry—from $11-48—for every Beef Checkoff dollar invested in the marketing programs.   *Id.* at 9.   So the $2.68 million heist involves millions more lost when considering the opportunity costs of those embezzlement proceeds.   The fraud revelations also came at a particularly sensitive time over the past year, when the Oklahoma Cattlemen's Association was initiating an industry vote to supplement the federal Checkoff Program with a state program.   In early November this year, Oklahoma cattle producers voted <u>not</u> to double the $1 per-head assessment on cattle sales.   Ms. Morton's embezzlement may well have affected that outcome, "as some beef producers have lost faith in the Oklahoma Beef Council."   *Id.* at 18 (statement of Oklahoma Cattlemen's Association).

Moreover, the particular details of the seven-year embezzlement scheme are egregious.   Each year from 2010 to 2016, Ms. Morton forged the signature of the OBC's Executive Director on more than 100 checks payable to herself.   *Id.* ¶17.   Notably, the scheme had escalated during the last

6

three years. The period of 2014, 2015, and 2016 included the three highest annual embezzlement amounts, and the average size of each forged check continued to rise, from approximately $3,410 in 2014 to $4,321 in 2016. Ms. Morton was on track in 2016 for her biggest year yet; by late July 2016, she had already embezzled $458,078.75. In addition, Ms. Morton did not stop this scheme on her own; the spree ended only when the OBC and its bank connected the dots and confronted Ms. Morton in July 2016.[2]

Finally, the government has little concern that Ms. Morton will ever be in position to re-offend at this scale. Still, Section 3553(a) requires the Court to consider not only specific deterrence but also general deterrence with any sentencing decision. Meaningful jail time is necessary to send a powerful message—that crippling fraud for a non-profit carrying out a federal program yields serious consequences.

---

[2] To date, Ms. Morton has repaid approximately $237,874.41 to the OBC. Doc. 19, at 5-6 Doc. 17, ¶ 22. Again, the U.S. Attorney's Office appreciates the unusual restitution efforts from Ms. Morton's sale of two homes and allocation of store profits from Marissa's Room to the OBC. Unfortunately, this amount paid back to the OBC accounts for less than 9% of the total embezzlement. And Ms. Morton's repayments still don't cover all of the OBC's professional fees in dealing with this matter. Doc. 17, ¶ 20.

## **CONCLUSION**

Ms. Morton and her counsel have cooperated fully with the government and tried to make the best of a bad situation since July 2016, when the embezzlement came to light. But the scheme's size, duration, and impact respectfully warrant much more than the six months of jail time that the defense requests. A meaningful sentence of imprisonment—at the lower end of the advisory guidelines range of 57 to 71 months' imprisonment—is necessary to satisfy Section 3553(a)'s sentencing factors for Ms. Morton.

        Respectfully submitted,

        MARK A. YANCEY
        United States Attorney

        *s/ Chris M. Stephens*
        CHRIS M. STEPHENS
        Oklahoma Bar No. 20345
        Assistant U.S. Attorney
        210 W. Park Avenue, Suite 400
        Oklahoma City, Oklahoma 73102
        (405) 553-8783 (office)
        (405) 553-8888 (fax)
        chris.stephens@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 19, 2017, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Peter Scimeca, counsel for Ms. Morton.

                                          *s/ Chris M. Stephens*
                                          CHRIS M. STEPHENS